**The CURTIS PUBLISHING COMPANY,
Appellant,**

v.

**Colonel T. B. BIRDSONG et al., Appellees.**

**No. 22277.**

United States Court of Appeals
Fifth Circuit.

Jan. 26, 1966.

As Amended May 10, 1966.

T. Eric Embry, Birmingham, Ala.,
Philip H. Strubing, Philadelphia, Pa.,
Pepper, Hamilton & Scheetz, Philadel-
phia, Pa., Beddow, Embry & Beddow,
Birmingham, Ala., of counsel, for appel-
lant.

Winston B. McCall and M. B. Mont-
gomery, Birmingham, Ala., John Harris
Harper, Pritchard, McCall & Jones, Bir-
mingham, Ala., Barnett, Montgomery,
McClintock & Cunningham, Jackson,
Miss., of counsel, for appellees.

Before MARIS *, RIVES and BELL,
Circuit Judges.

MARIS, Circuit Judge.

This is an interlocutory appeal under
28 U.S.C. § 1292(b) from orders of the
District Court for the Northern District
of Alabama overruling the defendant's
motions to dismiss the plaintiffs' com-
plaint for failure to state a claim upon
which relief can be granted and to quash
the service of the summons and com-
plaint. The complaint was filed by
Colonel T. B. Birdsong, Commander of

* Of the Third Circuit, sitting by designation.

the Mississippi Highway Patrol, as a class action on behalf of himself and other members of the Patrol against The Curtis Publishing Company, as publisher of The Saturday Evening Post.

The complaint was amended to add as parties plaintiff 14 members of the Patrol. The amended complaint was served on the Alabama statutory agent of Curtis Circulation Company, a wholly owned subsidiary of the defendant. The district court quashed this service on the ground that the statutory agent of Curtis Circulation Company was not an agent of the defendant for the purpose of service of process. Substituted service was then made under the "long-arm" statute of Alabama[1] by serving the summons and amended complaint on the Alabama Secretary of State who mailed copies to the defendant in Philadelphia. Shortly thereafter the plaintiffs filed a second amended complaint. Thereafter the district court overruled the defendant's motions to quash the substituted service and to dismiss the complaint for improper venue but sustained its motion to dismiss the complaint for failure properly to identify the plaintiffs. Thereupon the plaintiffs filed a third amendment to the complaint. The defendant's motion to dismiss this third amended complaint was overruled by the district court.

The complaint, as amended, sought damages for an alleged libel contained in an article appearing in the issue of the Post of November 10, 1962, entitled "What Next in Mississippi?". The article dealt with the tragic events which followed this court's mandate in the case of Meredith v. Fair, 1962, 305 F.2d 343, and described in some detail the events occurring before, during and after the registration of James Meredith as a student at the University of Mississippi at Oxford. The following is alleged to be the libelous portion of the article:

"A sizable portion of blame must go to the gray-uniformed men of the Mississippi Highway. Patrol. 'Those bastards just walked off and left us,' said one top official of the Department of Justice."

The claim of libel is based on the use of the words "those bastards" which are averred to be "obscene and fighting words of and concerning plaintiffs and reflecting on their personal reputation." The orders overruling the motion to quash the substituted service and to dismiss the third amended complaint are the subjects of the present appeal.

We consider first the refusal of the district court to quash the substituted service on the defendant under the Alabama "long-arm" statute. That statute, by its express terms, applies only to non-resident persons, firms, partnerships or corporations "who shall do any business or perform any character of work or service in" Alabama. Moreover it applies only to an action "accrued, accruing, or resulting from the doing of such business, or the performing of such work or service, or relating to or as an incident thereof, by any such non-resident, or his, its or their agent, servant or employee." The defendant asserts that it has not done any business or performed any character of work or service in Alabama within the meaning of the statute, and that if it be held that it did business

1. "Any non-resident person, firm, partnership, general or limited, or any corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall do any business or perform any character of work or service in this state shall, by the doing of such business or the performing of such work, or services, be deemed to have appointed the secretary of state, * * * to be the true and lawful attorney or agent of such non-resident, upon whom process may be served in any action accrued, accruing, or resulting from the doing of such business, or the performing of such work or service, or relating to or as an incident thereof, by any such non-resident, or his, its or their agent, servant or employee. And such service shall be valid whether or not the acts done in Alabama shall of and within themselves constitute a complete cause of action. * * * The party to a cause filed or pending, * * * under the provisions of this section shall make and file in the cause an affidavit stating facts showing that this section is applicable * * *." 7 Ala.Code § 199(1).

in Alabama through Curtis Circulation Company as its agent, the present action did not accrue or result from the doing of that business.

Whether the substituted service of process under the Alabama statute was effective to give the district court personal jurisdiction of the defendant poses at least three questions a negative answer to any one of which will require denial of such jurisdiction. The first of these questions is whether the Legislature of the State of Alabama intended the statute to have a scope broad enough to bring in a nonresident defendant whose activities in the state are no greater than those rather minimal activities in which the defendant in this case engaged. The second question is whether those activities in the State would have been sufficient under the due process clause of the Fourteenth Amendment to establish those minimum contacts, ties and relations with the State of Alabama which the Supreme Court has held to be necessary to support the exercise of extra-territorial jurisdiction. And the third question is whether, under the particular facts of this case, the State of Alabama had a sufficient interest in the litigation to justify, under the due process clause, the exercise of extra-territorial jurisdiction by a court in Alabama over the nonresident defendant. Since we are clear that the answer to this last question is decisive of the issue of jurisdiction we do not reach or attempt to answer the first two questions.

■■ The Supreme Court has made it perfectly clear that in this type of situation the State which seeks to subject a nonresident to its judicial jurisdiction must have a definite interest in the litigation. Thus in the leading case of International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, the suit was by the State itself, seeking taxes. In McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223, the validity of the in personam jurisdiction turned on California's paramount interest in the litigation. The Supreme Court referred to California's "manifest interest" in protecting "its residents." "These residents", the Supreme Court said, [355 U.S. at 223, 78 S.Ct. at 201] "would be at a severe disadvantage if they were forced to follow the insurance company to a distant State." In Hanson v. Denckla, 1958, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, the Supreme Court emphasized the absence of substantial State interest in distinguishing McGee. The Court said [357 U.S. at 251, 78 S.Ct. at 1238]: "The cause of action in this case is not one that arises out of an act done or transaction consummated in the forum State." In a realistic sense, we believe that the same can be said for the present case.

The article containing the alleged libel was written by Robert Massie, a contract writer dealing with the Post as an independent contractor. Massie, a resident of the State of New York, wrote the article at his home after personally observing the riots of September 30 and October 1, 1962 and spending some ten days of investigation in Mississippi. Thereafter, his manuscript was submitted to the editors of the Post in New York City where it was edited. At no time did Mr. Massie or any representative of the Post visit Alabama or interview residents of this State in connection with the preparation of the article. The article makes no mention of Alabama citizens or residents (the plaintiffs are all citizens and residents of Mississippi) and describes events which took place entirely outside Alabama's boundaries. It cannot be said that the Post article had any greater impact on Alabama than the trust instrument in Hanson had on the Florida litigants. In Hanson the Supreme Court again emphasized that the pivotal factor in McGee was the State's interest in protecting its citizens. Hanson v. Denckla, 1958, 357 U.S. 235, 252, 78 S.Ct. 1228, 2 L.Ed.2d 1283.

■ There must be a rational nexus between the fundamental events giving rise to the cause of action and the forum State which gives that State sufficient interest in the litigation before it may

constitutionally compel litigants to defend in a foreign forum.[2] This seems to be what the Supreme Court meant when it spoke of the "relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 319, 66 S.Ct. 154, 160, 90 L.Ed. 95.

What interest does Alabama have in this lawsuit? The injury, if any, is primarily to persons in Mississippi where the plaintiffs live and work and where all the operative events giving rise to this suit occurred. Caldwell v. Crowell-Collier Publishing Co., 5 Cir. 1947, 161 F.2d 333, was a suit by the Governor of Florida against Collier Magazine. Judge Sibley, speaking for this Court, there said [161 F.2d at 335]:

> " * * * Publication is averred in Florida and throughout the United States, but the injury must have occurred mainly in Florida where the plaintiff resides and holds office, and the law of Florida is principally to be regarded."

In the present case, all of the witnesses as to the operative facts are found in States other than Alabama. The only interest Alabama might have is to protect its citizens against reading libels distributed in Alabama about persons not present in this State. That interest in this litigation is shared by 49 other States, including Mississippi,[3] and a number of foreign countries where the Post is sold. Could the plaintiffs commence 50 lawsuits against the defendant? Is Alaska or Hawaii really a proper forum for this suit? We think not. This case raises the difficult problems occasioned by multi-state publications. These situations will grow more common and we must be careful to evolve a rule that will be fair both to those injured and those who through normal commercial activity are exposed to the spector of multi-state litigation. We conclude that there is no rational nexus between Alabama and the parties or the injury, that Alabama is not a constitutionally permissible forum, and that the motion to quash the extra-territorial service should, therefore, have been granted. Any other ruling would involve the danger of severe burdens on and impediments to interstate commerce. It takes no great stretch of the imagination to see that businesses operating throughout the United States could be exposed to numerous frivolous and harassing lawsuits. To permit this result would seriously impair the guarantees which the due process clause sought to secure and would offend our "traditional notions of fair play and substantial justice." International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95. As Judge Sobeloff said in Erlanger Mills v. Cohoes Fibre Mills, 4 Cir. 1956, 239 F.2d 502, 509:

> "The Constitution which was ordained 'to form a more perfect union,' contemplates that the boundaries between the states shall have continued significance for some purposes

---

2. The litigants need not be residents or citizens of the forum State for there to be a rational nexus between the forum and the cause of action. In Elkhart Engineering Corp. v. Dornier Werke, 5 Cir. 1965, 343 F.2d 861, we approved the application of the Alabama long-arm statute in a suit by a Wisconsin corporation against a German corporation where the fundamental events giving rise to the cause of action occurred in Alabama.

3. The plaintiffs' interest in suing in Alabama is not hard to discern. The Mississippi long-arm statute is much narrower than Alabama's. See Walker v. Savell, 5

Cir. 1964, 335 F.2d 536; see also, Mississippi Chemical Corp. v. Vulcan-Cincinnati, Inc., D.C.Miss.1963, 224 F.Supp. 11, aff'd on appeal, Mississippi Chemical Corp. v. Hoechst-Uhde Corp., 5 Cir. 1964, 338 F.2d 662. Plaintiffs misconceive their remedy. It is not a suit brought in a foreign forum but an appeal to the Mississippi legislature. If the State of Mississippi has not provided statutory service of process adequate to protect its citizens, that is a legislative judgment, the wisdom of which federal courts are not permitted to question. It is the legislature of Mississippi and not this Court which must provide a remedy.

**348**

though not for all. If one State may, without violation of the due process clause, extend the authority of its courts beyond its boundaries over persons and situations not sufficiently related to that State, the separate identity of the States will be reduced to a mere fiction. Individual states could undertake at the expense of other States to enlarge the sphere of their authority to nationwide dimensions. It requires no flight of fancy to foresee the resulting maze of lawsuits adjudicating the interests of persons having only the faintest and most remote links with the State exercising authority. If the due process clause is not effective to restrain such extensions of local power, then the federal system is likely to be transformed into something very different from anything we have known."

■ The defendant also strongly urges that, in any event, the district court erred in refusing to dismiss the third amended complaint for failing to state a claim for which relief could be granted. We agree. It is not entirely clear whether the plaintiffs are alleging that by the use of the phrase "those bastards" the allegedly libelous article questioned the legitimacy of their birth. However this may be, it is perfectly clear that no reasonable person of ordinary intelligence could believe that the person whom the author of the article was quoting was accusing every member of the Mississippi Highway Patrol who was on duty at Oxford of having been born out of wedlock. On the contrary it is perfectly apparent that these words were used as mere epithets, as terms of abuse and opprobrium. As such they had no real meaning except to indicate that the individual who used them was under a strong emotional feeling of dislike toward those about whom he used them. Not being intended or understood as statements of fact they are impossible of proof or disproof. Indeed such words of vituperation and abuse reflect more on the character of the user than they do on that of the individual to whom

they are intended to refer. It has long been settled that such words are not of themselves actionable as libelous. Robbins v. Treadway, 1829, 25 Ky. (2 J.J. Marsh.) 540, 541; Rice v. Simmons, 1838, 2 Del. (2 Harr.) 417, 31 Am.Dec. 766; Dalton v. Woodward, 1938, 134 Neb. 915, 280 N.W. 215; Barry v. Kirkland, 1948, 149 Neb. 839, 32 N.W.2d 757; Dorney v. Dairymen's League Cooperative Ass'n, D.C.N.J.1957, 149 F.Supp. 615; Rawlins v. McKee, Tex.Civ.App. 1959, 327 S.W.2d 633.

■ Judge Harrington speaking for the Court of Errors and Appeals of Delaware in Rice v. Simmons, 1838, 2 Del. (2 Harr.) 417, 429, long ago stated it to be the rule:

"* * * That mere general abuse and scurrility, however ill-natured and vexatious, is no more actionable when written than spoken, if it do not convey a degrading charge or imputation. Against all such attacks, a man needs no other protection than a good character; and the law will not suppose that damage can happen to such a character from the pointless arrows of mere vulgarity."

This is still the law.

The orders of the district court will be reversed and the cause remanded with directions to quash the substituted service and dismiss the amended complaint.

RIVES, Circuit Judge (concurring specially):

I agree fully with the conclusion that there is no rational nexus between Alabama and the parties or the injury, and that Alabama is not a constitutionally permissible forum for this litigation. However, since this holding is an answer to the constitutional problem which we call the third question, I think that the Court should first conclude that an affirmative answer is required to the question of statutory construction which we call the first question.

Whenever a plaintiff attempts to subject a defendant to personal jurisdiction

through the use of a long-arm statute, two basic questions are raised. First, did the State intend that under the present circumstances substitute service of process could be invoked in order to subject the defendant to personal jurisdiction? Second, does the Constitution of the United States permit substitute or extraterritorial service of process under the present circumstance?[1]

Does the mailing of 69,552 copies per issue of Post into Alabama and the occasional visits within the State of Post's advertising solicitors constitute doing "any business" under the Alabama statute? The defendant cites cases like Buckley v. New York Times Company, 5 Cir. 1964, 338 F.2d 470, arguing that it was not doing "any business" as that term is employed in the Alabama long-arm statute. The *Buckley* case and its predecessors are not dispositive of the issue before us. *Buckley* involved a Louisiana statute, not the broad Alabama statute. It interpreted that statute and its constitutionally permissible limits by reference to two federal cases— Street & Smith Publications v. Spikes, 5 Cir. 1941, 120 F.2d 895, cert. den., 314 U.S. 653, 62 S.Ct. 102, 86 L.Ed. 524, and Insull v. New York World-Telegram Corp., 7 Cir. 1959, 273 F.2d 166.

The *Street* case is a Texas case that preceded the present liberalization of the use of long-arm statutes and may very well no longer be good law even in Texas. Cf. Atwood Hatcheries v. Heisdorf & Nelson Farms, 5 Cir. 1966, 357 F.2d 847. The *Insull* case is an Illinois case. Much water has flowed under the bridge since it was written and it also may no longer be good law. See Currie, The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois, 1963 U.Ill.L.F. 533.

Underlying the conclusions of the Seventh Circuit in *Insull* was the fact that Illinois law views the tort of libel as complete at the time of first publica-

tion. Thus the entry of the defamatory article into Illinois did not constitute a new tort but was "only relevant in computing damages." Alabama takes an entirely different view. While Alabama agrees with Illinois law that every publication of a libel is relevant in computing damages, Alabama is a republication State, viewing the entry of the libelous material as giving rise to a new cause of action.

The Supreme Court of Alabama has authoritatively held that under circumstances analogous to those found in the instant case there is sufficient activity to constitute doing any business under the Alabama statute. New York Times Co. v. Sullivan, 1962, 273 Ala. 656, 144 So.2d 25, rev'd on other ground, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. In the *New York Times* case the Alabama Supreme Court held as follows (144 So.2d at 33–34):

> "Justice demands that Alabama be permitted to protect its citizens from tortious libels, the effect of such libels certainly occurring to a substantial degree in this State.
>
> \*     \*     \*     \*     \*
>
> "As to appellant's second contention that the cause did not accrue from any acts of The Times in Alabama, it is our conclusion that this contention is without merit.
>
> "Equally applicable to newspaper publishing are the observations made in Consolidated Cosmetics v. D–A Pub. Co., Inc., et al., 7 Cir., 186 F.2d 906 at 908, relative to the functions of a magazine publishing company:
>
> " 'The functions of a magazine publishing company, obviously, include gathering material to be printed, obtaining advertisers and subscribers, printing, selling and delivering the magazines for sale. Each of these, we think, constitutes an essential factor of the magazine publication business. Consequently if a non-resident corpo-

---

1. The State's right to subject nonresidents to *in personam* jurisdiction by extraterritorial service of process is limited by the due process clause of the fourteenth amendment.

ration sees fit to perform any one of those essential functions in a given jurisdiction, it necessarily follows that it is conducting its activities in such a manner as to be subject to jurisdiction.'

"*It is clear under our decisions that when a nonresident prints a libel beyond the boundaries of the State, and distributes and publishes the libel in Alabama, a cause of action arises in Alabama, as well as in the State of the printing or publishing of the libel.* Johnson Publishing Co. v. Davis, 271 Ala. 474, 124 So.2d 441; Weir v. Brotherhood of Railroad Trainmen, 221 Ala. 494, 129 So. 267; Bridwell v. Brotherhood of Railroad Trainmen, 227 Ala. 443, 150 So. 338; Collins v. Brotherhood of Railroad Trainmen, 226 Ala. 659, 148 So. 133.

"The scope of substituted service is as broad as the permissible limits of due process. Boyd v. Warren Paint & Color Co., 254 Ala. 687, 49 So.2d 559; Ex parte Emerson, 270 Ala. 697, 121 So.2d 914." (Emphasis added.)

Accord, Connor v. New York Times, 5 Cir. 1962, 310 F.2d 133 (involving the same Alabama statute); cf. Gray v. American Radiator & Sanitary Corp., 1961, 22 Ill.2d 432, 176 N.E.2d 761. It should be remembered that the Alabama statute, unlike the Illinois statute construed in *Gray*, does not contain a provision for torts committed within the State. If it did, our search would be ended as to Alabama citizens since the effective tort would be here. Since it is not a tort statute, we must look to the question of doing "any business." Dooly v. Payne, 5 Cir. 1964, 326 F.2d 941, 945.

Therefore, unlike the situation in Buckley v. New York Times Co., 5 Cir. 1964, 338 F.2d 470, the State Supreme Court has already held that activities such as here present constitute doing "any business" as that term is used in the Alabama long-arm statute. Moreover, the number of papers circulated in Louisiana in the *Buckley* case both in absolute and comparative terms was considerably less than the circulation of

the Post in Alabama. The Times had a maximum circulation of 1,784 papers on Sunday and only 391 papers per day during the rest of the week. The New York Herald Tribune had a maximum daily circulation of 43 papers and the Charleston Gazette managed to sell only one paper containing the libel, while the Cincinnati Post and Times Star averaged only 13 papers per day. The Commercial Appeal, Florida Times-Union and Des Moines Town Register fared no better. None of these papers had any substantial contact with Louisiana. Judge Brown dissented from the Court's holding as to the 1,784 issues of the New York Times. Certainly 69,552 copies of the Post circulated in Alabama constituted substantially more significant contact than any present in the Buckley case. If the present case involved Alabama citizens or residents, I would hold that the service of process was valid. Connor v. New York Times, 5 Cir. 1962, 310 F.2d 133.

Under the facts of this case, I fully concur in the amended opinion and would add a few remarks.

The history of the long-arm statutes indicates that one of their major purposes was to allow the forum state to take jurisdiction in order to protect its citizens where fundamental events giving rise to the cause of action took place in the forum state. The very restrictive concepts the Supreme Court had adopted in Pennoyer v. Neff, 1877, 95 U.S. 714, 24 L.Ed. 565, were shed in International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95. The Supreme Court said (326 U.S. at 316, 66 S.Ct. at 158):

"Historically the jurisdiction of courts to render judgment *in personam* is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. Pennoyer v. Neff, 95 U.S. 714, 733 [24 L.Ed. 565]. But now that the *capias ad respondendum* has given way to personal service of

summons or other form of notice, due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

Lest the casual reader think the process of determining when a corporation is amenable to suit is purely mechanical, the Supreme Court went on to say (326 U.S. at 319, 66 S.Ct. at 159):

"The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. St. Louis S. W. R. Co. [of Texas] v. Alexander, supra, 227 U.S. [218] 228 [33 S.Ct. 245, 57 L.Ed. 486]; International Harvester Co. [of America] v. Com. of Kentucky, supra, 234 U.S. [579] 587 [34 S.Ct. 944, 58 L.Ed. 1479]. *Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.* That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations. Cf. Pennoyer v. Neff, supra [95 U.S. 714, 24 L.Ed. 565]; Minnesota Commercial Men's Ass'n v. Benn, 261 U.S. 140 [43 S.Ct. 293, 67 L.Ed. 573]."

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." (Emphasis added.)

The holding in International Shoe has been summarized as the "minimum contacts" principle and was amplified in McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed. 2d 223. International Life assumed the obligations of another life insurance company in 1948. From its principal place of business in Texas, International Life mailed to McGee in California a reinsurance certificate. McGee accepted and continued to mail premiums to International Life in Texas until his death in 1950.[2] The record revealed no contacts with California other than this single policy. In sustaining the validity of the extraterritorial service of process for the suit in California,[3] the Supreme Court said (355 U.S. at 223, 78 S.Ct. at 201):

"Turning to this case we think it apparent that the Due Process Clause did not preclude the California court from entering a judgment binding on respondent. It is sufficient for purposes of due process that the suit was based on a contract which had sub-

2. While that case involved only a single contract, it is not precedent for the proposition that a single sale is sufficient to constitute the minimum contact required by due process. That must be determined on a case by case basis, taking into account all of the circumstances. See Elkhart Engineering Corp. v. Dornier Werke, 5 Cir. 1965, 343 F.2d 861 (applying the Alabama statute to a single occurrence); Rosenblatt v. American Cyanamid Co., 1965, 86 S.Ct. 1, 3, 15 L.Ed.2d 39. The

sending of premiums to International Life constituted a continuing course of conduct. Cf. Erlanger Mills v. Cohoes Fibre Mills, 4 Cir. 1956, 239 F.2d 502; Dooly v. Payne, 5 Cir. 1964, 326 F.2d 941.

3. This suit arose when the plaintiffs attempted to enforce their California judgment in the Courts of Texas. The Court of Civil Appeals of Texas held that the California service of process was invalid and refused to enforce the judgment. The United States Supreme Court reversed.

tantial connection with that State. Cf. Hess v. Pawloski, 274 U.S. 352 [47 S.Ct. 632, 71 L.Ed. 1091]; Henry L. Doherty & Co. v. Goodman, 294 U.S. 623 [55 S.Ct. 553, 79 L.Ed. 1097]; Pennoyer v. Neff, 95 U.S. 714, 735 [24 L.Ed. 565]. The contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died. It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims. These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable."

In Hanson v. Denckla, 1958, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, the Supreme Court held extraterritorial service of process insufficient to gain personal jurisdiction over a trustee where the court below had read *International Shoe* too broadly:

" * * * progress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome. In response to these changes, the requirements for personal jurisdiction over nonresidents have evolved from the rigid rule of Pennoyer v. Neff, 95 U.S. 714 [24 L.Ed. 565], to the flexible standard of International Shoe Co. v. State of Washington, 326 U.S. 310 [66 S.Ct. 154, 90 L.Ed. 95]. But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. See Vanderbilt v. Vanderbilt, 354 U.S. 416, 418 [77 S.Ct. 1360, 1 L.Ed.2d 1456]. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him. See International Shoe Co. v. State of Washington, 326 U.S. 310, 319 [66 S.Ct. 154, 90 L.Ed. 95]." [4]

Thus the teachings as to nonresident jurisdiction reveal several key principles. It is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, supra, 357 U.S. at 253, 78 S.Ct. 1228, at 1240, 2 L.Ed.2d 1283. In the instant case, I think this part of the formula is clearly fulfilled. Post circulates over 60,000 copies per issue in Alabama out of the 6,500,000 copies published, or about .008% of its total circulation. In addition, over 4,000 copies are sold off newsstands. On occasions Post solicits advertising in Alabama. I submit that Post has actively submitted itself to the benefits of Alabama's fruitful market place just as much as did International Life with its single contract of insurance in the McGee case.

4. In Dooly v. Payne, 5 Cir. 1964, 326 F.2d 941, 943, this Court, speaking through Judge Jones, in construing the Alabama long-arm statute, warned of the federal constitutional limits:

"The McGee case was followed in the same term, by Hanson v. Denckla [357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283] which teaches that, although the door of non-resident jurisdiction has been opened wider by International Shoe Co. [326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 2d 95] and McGee [355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223], it has not been removed from its hinges, and it is stated to be the rule that 'it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283. It is the quality and nature of the activity rather than mechanical tests, that are controlling in determining whether the minimum contacts test of due process has been met, and each case is to be decided on its facts and under the law of the forum state."

Having accepted the benefits of the market place, it cannot complain that one of the fruits of the harvest was a lawsuit.

But there is a second essential ingredient necessary before the formula can be followed to successful *in personam* jurisdiction; and that is the State's interest in the litigation. The amended opinion clearly and correctly concludes that this second essential ingredient is lacking and therefore the service of process must be quashed.